UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET |
| VERSUS | * | NUMBER 22-173 |
| DAVID THOMPSON | * | SECTION "M" |

### MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS

David Thompson respectfully moves this Honorable Court to suppress all evidence and statements obtained by law enforcement officers during and as a result of the traffic stop conducted on his vehicle on July 7, 2022. As described below, officers did not have reasonable suspicion to initiate the traffic stop and thus violated Mr. Thompson's Fourth Amendment right to be free from unreasonable searches and seizures, mandating suppression of all evidence derived from the stop.

### RELEVANT BACKGROUND[1]

On July 7, 2022, at around 5:30 p.m., David Thompson was driving home when he was stopped, surrounded, and detained by at least six Louisiana State Police vehicles containing nearly a dozen law enforcement officers.[2] The stop was initiated by Louisiana State Troopers Lawrence Williams and Nicholas Dowdle, who were advised by NOPD Detective Chad Cockerham that he saw "a black male with dreadlocks clad in white pants, white shirt, and gray shoes conceal a firearm in his pocket" at the corner of Allen Street and N. Rocheblave Street.[3] Detective Cockerham reportedly advised Troopers Williams and Dowdle that he saw the man exit Richard's Food Store at that intersection, enter a silver Hyundai Elantra, and begin traveling on Allen Street toward North Galvez Street.[4]

---

[1] This section refers to body camera footage from the traffic stop, which is being provided to the Court on a CD labeled "Exhibit B." The cited Bates numbers correspond with the file names for the videos.
[2] *See* Ex. B, Bates No. 000071 (Ex. B-71). One vehicle was an unmarked truck in front of Mr. Thompson.
[3] *See* Ex. A (NOPD Gist Sheet).
[4] *Id.*

1

Troopers Williams and Dowdle observed the vehicle travel on North Galvez and cross Elysian Fields.[5] About a block later, an unmarked truck driven by a law enforcement officer abruptly stopped in front of Mr. Thompson as five Louisiana State Police SUVs pulled up behind him with their lights activated. Several officers exited the vehicles, surrounded Mr. Thompson with guns drawn, and ordered him out of the car with his hands up.[6] Mr. Thompson complied.

Sergeant Talmadge Dixon and Trooper Williams began handcuffing Mr. Thompson, and Sergeant Dixon instructed another officer, Trooper Webster, to "clear the car."[7] Trooper Webster peered into the windows of the vehicle and reported back that the car was clear.[8] Sergeant Dixon then instructed Trooper Webster to read Mr. Thompson his *Miranda* rights and to "pat him down and see if that 95 is on him or not."[9] At that point, officers who were looking through the windows into Mr. Thompson's car stated they could smell marijuana.[10] One officer then stated that he could see "a little blunt right there" inside the car.[11] Based on that, they searched his car for the gun.

As soon as a searching officer opened the driver's side door, Sergeant Dixon asked him if he could "see the 95."[12] The officer initially did not, but, after about 35 seconds of searching, he announced: "There it is."[13] The officer had located the gun in the center console. At that point, Sergeant Dixon instructed Trooper Webster: "You already read him his rights, pat him down, put him in the car."[14] Mr. Thompson was taken into custody, and officers subsequently determined that he had a prior felony conviction and thus was prohibited from possessing a firearm.

---

[5] *Id.*
[6] *See* Ex. B, Bates No. 000072 (Ex. B-72).
[7] *Id.* at 1:03; *see also* Ex. B, Bates No. 000075 (Ex. B-75), at 1:00.
[8] Ex. B-72, at 1:03-1:09.
[9] Ex. B-72, at 1:20, 2:00; Ex. B-75, at 1:16-2:04.
[10] Ex. B-72, at 2:08; Ex. B-75, at 2:05.
[11] Ex. B-72, at 2:16; Ex. B-75, at 2:14.
[12] Ex. B-75, at 2:30.
[13] *Id.* at 3:05.
[14] *Id.* at 3:10.

## **LEGAL FRAMEWORK**

"The Fourth Amendment requires a traffic stop to be justified when it begins," and "any subsequent actions must be 'reasonably related in scope to the circumstances that justified the stop.'" *United States v. Walker*, 49 F.4th 903, 906–07 (5th Cir. 2022) (citations omitted). "A traffic stop is justified at its inception when an officer has an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Id.* (quotation marks and citation omitted). In assessing whether reasonable suspicion for a traffic stop existed, courts "must look at 'the totality of the circumstances' of each case to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "[A] mere hunch will not suffice." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

The Fifth Circuit has held that courts should "review the legality of police investigatory stops in a two-part test." *See United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (citing *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004)). "[F]irst, [the court] examine[s] whether the officer's action was justified at its inception[.]" *Id.* "[T]hen, [the court] inquire[s] whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* Because a seizure under the Fourth Amendment "must be justified at its inception," *United States v. McKinney*, 980 F.3d 485, 491 (5th Cir. 2020), courts may consider only facts known to law enforcement at the time of the seizure in evaluating whether reasonable suspicion existed. *See United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). "As [the Fifth Circuit has] emphasized, an officer must have an individualized suspicion that relates to the

3

individual arrestee, not a category of offenders." *United States v. Castillo*, 804 F.3d 361, 369 (5th Cir. 2015) (Elrod, J., dissenting) (alterations, quotation marks, and citations omitted) (citing cases).

Finally, it is well established that the exclusionary rule applies not only to the direct products of an unconstitutional search but also to "other incriminating evidence derived from that primary evidence." *United States v. Jones*, 833 F. App'x 528, 536 (5th Cir. 2020) (citation omitted). The test for determining whether evidence is "fruit of the poisonous tree" is "whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun* v, 371 U.S. 471 at 488 (quoting R. Maguire, Evidence of Guilt 221 (1959)). Subsequently-obtained evidence is "derivative" and thus subject to exclusion where it "is the product of the primary evidence, or [] is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint[.]'" *Murray v. United States*, 487 U.S. 533, 536–37 (1988). Once a defendant proves a Fourth Amendment violation, "the burden shifts to the government to demonstrate why the exclusionary rule should not apply to the fruits of the illegal search or seizure." *United States v. Runyan*, 290 F.3d 223, 234 (5th Cir. 2002).

## **ARGUMENT**

Law enforcement officers initiated the traffic stop in this case based solely on their belief that the driver was previously observed carrying a concealed firearm in his pocket. The officers knew nothing about Mr. Thompson's identity at the time they initiated the stop, so there was no basis for them to suspect that he was legally prohibited from possessing a firearm. Thus, the question before this Court is whether observing an unknown individual with a concealed firearm constitutes reasonable suspicion of a crime. In Louisiana, it does not.

4

Louisiana state law does not prohibit all individuals from carrying concealed firearms. Instead, the law only criminalizes the intentional concealment of a firearm by a person who lacks a "valid concealed handgun permit issued." LA. REV. STAT. ANN. § 14:95(A)(1)(b). Importantly, Louisiana is a "shall issue" state with respect to concealed carry permits, which means the government *must* issue a permit to any citizen who meets the statutory requirements. *See* LA. REV. STAT. ANN. § 40:1379.3(A)(1) ("Notwithstanding any other provision of law to the contrary, the deputy secretary of public safety services of the Department of Public Safety and Corrections *shall issue* a concealed handgun permit to *any* Louisiana resident who qualifies for a permit under the provisions of this Section[.]" (emphasis added)). The requirements for obtaining a permit are not burdensome, LA. REV. STAT. ANN. § 40:1379.3(C), and the officers who stopped Mr. Thompson had no basis to believe that he did not qualify for and possess a "valid concealed handgun permit." Accordingly, the minimal facts known to the officers at the time they conducted the traffic stop were insufficient to establish reasonable suspicion to believe the driver committed a crime.

The lack of reasonable suspicion is even more apparent given the sheer number of concealed carry permits that exist in Louisiana. As of March 13, 2023, Louisiana State Police records showed 122,689 active concealed carry permits in the state, amounting to approximately 3.7% of the adult population (21 years or older).[15] Additionally, that statistic likely *under*estimates the number of people in the state who could be lawfully carrying a concealed handgun at any given time because Louisiana also recognizes the validity of out-of-state permits issued by all but twelve states. *See* La. Rev. Stat. Ann. § 40:1379.3(T)(2); *see also* Louisiana State Police Public Safety

---

[15] The number of permits was obtained by calling Louisiana State Police, Concealed Handgun Permit Unit (225-925-4867) on March 13, 2023. The agent with whom undersigned counsel spoke advised that there are currently 95,087 active five-year permits and 27,602 active lifetime permits. Census records from 2021 (the most recent available) estimate a total population in Louisiana of 3,354,571 adults aged 21 years or older in Louisiana. *See* U.S. Census Bureau, 2021 Am. Community Survey 1-Year Estimates, Table DP05: ACS Demographic and Housing Estimates, *available at* https://data.census.gov/table?g=0400000US22&tid=ACSDP1Y2021.DP05.

Services: Concealed Handgun Permit Unit, http://www.lsp.org/handguns.html#recip. Because concealed carry permits are readily accessible, held by a significant percentage of the population in Louisiana, and are recognized as valid even when issued by other states, there was no basis for the state troopers to reasonably suspect that Mr. Thompson committed a crime based solely on information that he was observed carrying a concealed firearm.

Neither caselaw nor treatises support the position that the officers here had reasonable suspicion that Mr. Thompson had committed or was in the process of committing a crime. Counsel has been unable to identify a single case in which the Fifth Circuit has held that information that a person was carrying a concealed firearm was alone sufficient to justify a *Terry* stop. And a leading Fourth Amendment treatise states the opposite:

> For example, if a policeman sees a suspicious bulge which possibly could be a gun in the pocket of a pedestrian who is not engaged in any suspicious conduct, the officer may not approach him and conduct a frisk. And this is so even though the bulge would support a frisk had there been a prior lawful stop.

W. LaFave & A. Scott, 4 Search & Seizure § 9.6(a) (6th ed. Oct. 2022).

Notably, the Ninth Circuit has expressly rejected the notion that carrying a concealed firearm in a "shall issue" state can establish reasonable suspicion of a crime. In *United States v. Brown*, the Ninth Circuit reversed the denial of a suppression motion where officers conducted a *Terry* stop based on an anonymous tipster's report that the defendant had a gun and the fact that the defendant, upon noticing the police pursuing him, attempted to flee. 925 F.3d 1150, 1152-53 (9th Cir. 2019). The Ninth Circuit reasoned that "[i]n Washington State, it is presumptively lawful to carry a gun" because "Washington is a 'shall issue state,' meaning that local law enforcement *must* issue a concealed weapons license if the applicant meets certain qualifications." *Id.* at 1154. The court thus concluded: "Considering the tipster's anonymity *and the presumptive legality of*

*carrying a concealed firearm in Washington*, the 'tip' alone did not create reasonable suspicion that Brown was engaged in any criminal activity." *Id.* at 1154 (emphasis added).[16]

Other circuits have reached similar conclusions, finding a lack of reasonable suspicion based on information that a person merely possessed a firearm. In *United States v. Ubiles*, law enforcement officers stopped and frisked an individual based on an anonymous tip that he possessed a gun at a street festival. 224 F.3d 213, 214 (3d Cir. 2000). The Third Circuit held that the firearm had to be suppressed, explaining that "a mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, [does not] justify an officer in stopping a suspect absent the reasonable suspicion required by *Terry*[.]" *Id.* at 217. Given the presumptive legality of carrying a firearm, the court equated the scenario to law enforcement stopping the defendant based on information he was carrying a wallet, which could contain evidence of a crime but cannot establish reasonable suspicion to stop and search him. *Id.* at 218; *see also United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012) ("Absent any information about the criminality of the firearms, the mere possession of the firearms could not provide [officers] with reasonable suspicion to stop the vehicle."); *United States v. Richmond*, 924 F.3d 404, 419 (7th Cir. 2019) (Wood, C.J., dissenting) ("The act of walking down the street with a visible gun or a possible gun under some clothing thus does not, without more, give rise even to a reasonable suspicion that the person is violating the law[.]"); *United States v. Jones*, 606 F.3d 964, 968-69 (8th Cir. 2010) (Loken, C.J., concurring) (stating that the Chief Judge would have affirmed suppression even if the officer had reasonable articulable suspicion that the defendant was carrying a concealed weapon).

---

[16] The Ninth Circuit later distinguished *Brown* in a case arising out of California, holding that an anonymous tip that a person was carrying a concealed firearm could, in *that* state, support reasonable suspicion because "the reasonable suspicion analysis is different in a jurisdiction that has different rules for carrying concealed weapons." *United States v. Bontemps*, 977 F.3d 909, 914 (9th Cir. 2020). The Ninth Circuit's reasoning in that case highlights the relevance of the state's concealed carry permit scheme in determining whether there is reasonable suspicion for a stop on the basis on information that a person is carrying a concealed firearm.

Because the law enforcement officers who stopped Mr. Thompson lacked reasonable suspicion that he committed or was committing a crime, the traffic stop was unconstitutional under the Fourth Amendment. Accordingly, the firearm that was located during the search of his vehicle must be suppressed, along with any and all statements that Mr. Thompson made to police officers during and after the stop.

## **CONCLUSION**

For the reasons discussed above, Mr. Thompson respectfully requests that this Court suppress all evidence discovered through and as a result of law enforcement's unlawful stop of his vehicle on July 7, 2022. Alternatively, Mr. Thompson requests that the Court hold an evidentiary hearing on the motion.

Respectfully submitted, this 13th day of March, 2023.

CLAUDE J. KELLY
Federal Public Defender

*/s/ Samantha Kuhn*
SAMANTHA J. KUHN
Assistant Federal Public Defender
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
samantha_kuhn@fd.org
Bar No. TX 24083333

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to the following: David Haller, Assistant United States Attorney, 650 Poydras Street, 16th Floor, New Orleans, Louisiana 70130.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: N/A.

                                              */s/ Samantha Kuhn*
                                              SAMANTHA J. KUHN
                                              Assistant Federal Public Defender