UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 22-173 |
| DAVID THOMPSON | SECTION M (1) |

**ORDER & REASONS**

Before the Court is a motion to suppress filed by defendant David Thompson in which he seeks to exclude any evidence obtained in connection with the July 7, 2022 traffic stop of his vehicle.[1] The United States of America (the "Government") opposes the motion,[2] and Thompson replies in further support of it.[3] On April 13, 2023, the Court held an evidentiary hearing.[4] At the hearing, the Government presented the testimony of Task Force Officer Chad Cockerham, Sr., who was directly involved in the initial surveillance of Thompson that ultimately led to the investigatory stop resulting in Thompson's arrest. The Government also presented the footage[5] captured by the Real-Time Crime Center ("RTCC") camera that Officer Cockerham was operating at the time of his surveillance of Thompson, as well as an audio recording[6] of the radio communications between Officer Cockerham and various other law enforcement officers involved in the investigation. Having considered the parties' memoranda, the testimony and other evidence admitted at the hearing, and the applicable law, the Court issues this Order & Reasons denying the motion to suppress.

---

[1] R. Doc. 31.
[2] R. Doc. 37.
[3] R. Doc. 43.
[4] R. Doc. 48.
[5] R. Doc. 37-1.
[6] R. Doc. 44-1.

I.  **BACKGROUND**[7]

On July 7, 2022, at approximately 5:17 p.m., Officer Cockerham, a task force officer with the New Orleans Police Department ("NOPD") assigned to the Federal Bureau of Investigation, was in a remote location conducting surveillance[8] of an area near the intersection of Allen and North Rocheblave streets in New Orleans when he observed an unknown person – later identified as Thompson – approach a group of other unidentified men in front of an abandoned property. During Thompson's interaction with the group, Cockerham observed the defendant "adjust a dark colored object that was fully concealed in his [right front] pocket."[9]  Upon further observation, "Cockerham was clearly able to see the handle of [a] firearm as it rested" in Thompson's pocket.[10] The firearm remained visible to Officer Cockerham until Thompson readjusted his shirt to conceal it once more.  It was at approximately this time that Officer Cockerham radioed into a secure communications channel to report, or "call out," his observation of Thompson carrying a concealed firearm so that other officers could initiate an investigatory stop.[11]

While responding officers were repositioning to the area, but before any investigatory stop occurred, Officer Cockerham observed Thompson walk to a vehicle, remove the firearm from his

---

[7] Unless indicated otherwise, the facts provided are based on Officer Cockerham's affidavit in support of an application for a complaint, R. Doc. 1 at 2-5, his testimony at the suppression hearing, the video footage from the RTCC camera he monitored, R. Doc. 37-1, and the audio recording of the radio communications between Officer Cockerham and the officers involved in the investigation.  R. Doc. 44-1.

[8] Officer Cockerham performed this surveillance while stationed at the New Orleans Office of Homeland Security's RTCC, a centralized facility that receives live video feed from cameras positioned throughout the city.  The facility is meant to "provide critical information to first responders in the field and to assist with investigations of criminal activity or quality of life concerns."  Off. of Homeland Sec. & Emergency Preparedness, *Real-Time Crime Center*, https://nola.gov/homeland-security/real-time-crime-center/ (last updated May 17, 2022).  According to Officer Cockerham, there are approximately 1,500 of these cameras installed throughout the city.

[9] R. Doc. 1 at 3.

[10] *Id.*

[11] Officer Cockerham testified that, in his capacity as a task force officer assigned to the RTCC, he is charged with observing "violations," meaning violations of the law, and reporting them to an intergovernmental task force of law enforcement officers so that they can further investigate the observed conduct.  He accomplishes this by relaying intelligence via a secure radio channel directly to officers from a variety of participating agencies, including the NOPD, the Louisiana State Police, and the FBI.  Officer Cockerham stated that he does not report every violation that he observes; instead, he only reports those violations that he believes, based on his training and experience, warrant additional police intervention or investigation.

pocket, get into the driver's seat, and place the gun somewhere within the passenger compartment of the car. Officer Cockerham then watched Thompson engage in behaviors that, based on his training and experience, were consistent with rolling a marijuana cigar. Thompson then lit the cigar and drove away in the vehicle. Officer Cockerham relayed his observations of these additional acts, as they were occurring, to the officers on the secure channel, and then requested mobile surveillance[12] of Thompson until the responding officers could relocate to his position because Thompson was on the move and no longer in view from the Allen and Rocheblave camera.

Within minutes, officers with the Louisiana State Police located Thompson and conducted an investigatory stop of his vehicle. The officers ordered Thompson from his car and detained him, whereupon Thompson admitted that he had been smoking marijuana. Officers, noticing the odor of marijuana emanating from the vehicle, then conducted a search of Thompson's car, which revealed remnants consistent with a marijuana cigar and a handgun in the center console of the passenger compartment. Based on this, officers arrested Thompson. Thereafter, in a single-count indictment, Thompson was charged with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[13]

**II.    PENDING MOTION**

Thompson argues that the officers who conducted the warrantless investigatory stop (or "traffic stop") and ensuing search of his vehicle violated his Fourth Amendment rights because, at the time of the stop, neither they nor Officer Cockerham possessed the requisite level of suspicion to justify the stop.[14] Specifically, Thompson argues that, in Louisiana, observing an unknown person's mere possession of a concealed firearm cannot alone constitute reasonable suspicion to

---

[12] Officer Cockerham testified that mobile surveillance in this instance meant surveillance accomplished by officers who followed Thompson in his car with unmarked, or "unconventional," vehicles.
[13] R. Doc. 19 at 1-2.
[14] R. Doc. 31-1 at 4.

warrant an investigatory stop.[15] He reasons: "Because concealed carry permits are readily accessible" in Louisiana, and because the responding officers did not have any knowledge that Thompson could not lawfully possess a concealed firearm, the officers had "no basis ... to reasonably suspect that [he] committed a crime based solely on information that he was observed carrying a concealed firearm."[16]

In opposition, the Government argues that, in Louisiana, the possession of a concealed firearm is presumptively unlawful and so Officer Cockerham's observation of such conduct justified an investigatory stop on that basis alone.[17] Nevertheless, the Government maintains that Officer Cockerham's "observations provided reasonable suspicion that Thompson was violating numerous laws, in addition to carrying a concealed firearm," particularly those prohibiting smoking marijuana while in possession of a concealed weapon or operating a vehicle.[18] And although the officers who conducted the investigatory stop of Thompson's vehicle did not personally observe the behavior that prompted Officer Cockerham's call for a stop, the Government argues that Officer Cockerham's observations are permissibly imputed to the responding officers via the collective knowledge doctrine because Officer Cockerham relayed what he had seen to the officers in the field.[19] Therefore, because Officer Cockerham had reasonable suspicion to seize Thompson himself, the officers who in fact detained Thompson could rely on Officer Cockerham's knowledge in order to effectuate a constitutionally permissible investigatory stop.[20]

---

[15] *Id.*
[16] *Id.* at 6.
[17] R. Doc. 37 at 3, 7-8.
[18] *Id.* at 4, 8-9.
[19] *Id.* at 6-7.
[20] *Id.* at 7.

In reply to the Government's opposition, Thompson argues that the observations Officer Cockerham made *after* his initial call for an investigatory stop of Thompson fail to cure his lack of reasonable suspicion because, under the collective knowledge doctrine, reasonable suspicion must exist at the time the order for an investigatory stop was issued.[21]  Because Officer Cockerham's observation of Thompson purportedly smoking marijuana in the vehicle did not occur until after the call for his stop was made, says Thompson, those observations are irrelevant to the reasonable suspicion analysis.  And, insists Thompson, because possession of a concealed firearm is not a crime in Louisiana if a concealed carry permit has been issued, Officer Cockerham's observation of the concealed gun did not establish the level of suspicion necessary to justify a stop.[22]  Therefore, the evidence gathered as a result of the stop must be suppressed.

### III.   LAW & ANALYSIS

#### A. Investigatory Stops and the Collective Knowledge Doctrine

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "The exclusionary rule, a judicially created deterrence measure, provides that evidence obtained by an unreasonable search or seizure generally may not be used as evidence of guilt at trial." *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022).  "Warrantless searches and seizures," such as the one here, "are *per se* unreasonable subject to certain narrow exceptions." *Id.*  When a warrantless search or seizure is at issue, "[t]he government bears the burden of showing an exception applies." *Id.*

Officers are permitted to make warrantless investigatory stops "based on reasonable suspicion that the person is engaged in criminal activity or wanted in connection with a completed

---

[21] R. Doc. 43 at 4-6.
[22] *Id.* at 7-11.

felony." *Id.* (citing, *inter alia*, *Terry v. Ohio*, 392 U.S. 1, 27-31 (1968)). The same standard applies to traffic stops. *See United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003) ("Because traffic stops are considered more similar to investigative detentions than formal arrests, we analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated in *Terry v. Ohio*.") (citation omitted). "In an analytical framework inspired by principles discussed in *Terry v. Ohio*, [courts] review the legality of police investigatory stops in a two-part test." *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (footnote omitted). That test requires courts to "first examine whether the officer's action was justified at its inception and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* (footnote omitted). "A traffic stop is justified at its inception when an officer has 'an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, *before* stopping the vehicle.'" *United States v. Walker*, 49 F.4th 903, 907 (5th Cir. 2022) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)) (emphasis added). In conducting a reasonable suspicion analysis, courts "'must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.'" *Lopez-Moreno*, 420 F.3d at 430 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* (citing *United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002)). When weighing the totality of the circumstances, "a court may not consider the relevant factors in isolation from each other." *Id.* (citing *Arvizu*, 534 U.S. at 274). "Relevant facts and considerations may include a description of a suspect, a suspect's

6

location and proximity to known or reported criminal activity, the timeliness of information or the stop, a suspect's behavior, and the officer's experience." *Alvarez*, 40 F.4th at 346.

"The facts leading to a finding of reasonable suspicion do not have to be based on a law enforcement officer's personal observation, but can also arise from the 'collective knowledge' of law enforcement entities, so long as that knowledge gives rise to reasonable suspicion and was communicated between those entities *at the time of the stop*." *United States v. Massi*, 761 F.3d 512, 521 (5th Cir. 2014) (emphasis added). As the Fifth Circuit has explained, "[t]he collective knowledge theory for reasonable suspicion applies so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013) (quoting *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007)).

### B. Whether Reasonable Suspicion Existed Prior to the Defendant's Stop

Thompson contends that "[l]aw enforcement officers initiated the traffic stop in this case based solely on their belief that the driver was previously observed carrying a concealed firearm in his pocket."[23] Because "[t]he officers knew nothing about Mr. Thompson's identity at the time they initiated the stop," argues Thompson, "there was no basis for them to suspect that he was legally prohibited from possessing a firearm," and so, he concludes, the Court must determine whether the mere observation of an unknown person possessing a concealed firearm can rise to the level of reasonable suspicion.[24] Thompson's argument in effect seeks to limit the facts relevant to the Court's reasonable suspicion analysis to Officer Cockerham's initial observations concerning the concealed firearm.[25] But such an artificial limitation prevents an analysis of the

---

[23] R. Doc. 31-1 at 4.
[24] *Id.*
[25] R. Doc. 31-2.

7

totality of the circumstances leading to Thompson's seizure. It also isolates from a "'necessarily fact-specific'" inquiry those "'factors which by themselves may appear innocent, [but which] may in the aggregate rise to the level of reasonable suspicion.'" *United States v. Reyes*, 963 F.3d 482, 488 (5th Cir. 2020) (quoting *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999)). Accordingly, the Court will weigh all of the pertinent factors – not just Thompson's possession of a concealed firearm – in determining whether officers had reasonable suspicion at the time they conducted the investigatory stop of the defendant.

First, Officer Cockerham testified that he observed Thompson exiting a food store – one that had been giving the police district "some issues" – near the intersection of Rocheblave and Allen streets. Officer Cockerham testified that this particular intersection had been the location of two homicides "on back-to-back days" in recent months, and that citizens regularly complained of narcotics distribution in the area. This background, according to Officer Cockerham, informed his decision to surveille the location where Thompson was observed. Although a person's presence in a high-crime area alone is insufficient to support a finding of reasonable suspicion, that factor "'is among the relevant contextual considerations in a *Terry* analysis.'" *United States v. McKinney*, 980 F.3d 485, 492 (5th Cir. 2020) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)) (alteration omitted). Thompson did not rebut Officer Cockerham's testimony describing the intersection as a high-crime area. Therefore, the Court finds Thompson's presence there to be a relevant factor in the reasonable suspicion analysis.

Next, Officer Cockerham testified that he observed Thompson approach a group of unknown men congregating in front of what he stated was "an abandoned property." As the men were talking, Officer Cockerham observed Thompson adjust and readjust his clothing such that the handle of a pistol clearly protruded from the front right pocket of his pants. Upon seeing the

firearm, Officer Cockerham immediately "called out" that observation to officers on the secure radio channel using the term "95," which, he testified, is police shorthand for a suspected firearms violation.[26] Officer Cockerham testified that he then informed officers on the secure radio channel that one of the unknown men with Thompson had been previously observed "distributing 966 from a bag ... draped around his shoulders."[27] The RTCC camera footage, as well as the audio recording of the radio communications, confirm Officer Cockerham's testimony that he relayed these observations to officers in the field.

More significantly for purposes of the motion to suppress, Officer Cockerham went on to testify that, as he continued to surveille Thompson, he watched the defendant leave the group of individuals and walk a short distance to a parked vehicle, a silver Hyundai Elantra. After witnessing the defendant remove the firearm from his pocket and place it in the car, Officer Cockerham stated that he observed Thompson get into the driver's seat and begin to roll what he believed to be a marijuana cigar (a "blunt").[28] He testified that he relayed this information to the officers on the radio channel (which included the officers responding to his earlier "call out"), and the audio and video recordings confirm his testimony. Officer Cockerham went on to testify that he believed Thompson was rolling a marijuana cigar because he watched Thompson discard what

---

[26] The term "95" is a shorthand reference to La. R.S. 14:95, which makes it a crime in Louisiana to carry a concealed weapon.

[27] Again, as Officer Cockerham testified, "966" is the term law enforcement officers use for a narcotics violation. *See* La. R.S. 40:966 (criminalizing drug possession and distribution). Officer Cockerham testified that he had personally observed a "hand-to-hand" transaction of narcotics between this individual and another person prior to Thompson's arrival at the location. This apparent transaction was not included in the footage provided because, according to Officer Cockerham, the footage was clipped to include only the portions relevant to Thompson. Further, Officer Cockerham testified that he did not observe Thompson purchase narcotics from this person. Officer Cockerham further explained that as he observed Thompson interacting with the group, he watched the individual allegedly engaged in narcotics distribution knot a plastic baggie in a manner consistent with drug possession and distribution – based on his training and investigative experience.

[28] The camera footage indicates that Officer Cockerham had an unobstructed view into the windshield of Thompson's car as Thompson faced the camera while seated in the driver's seat. It is from this angle that Officer Cockerham testified that he observed Thompson acting in a manner consistent with rolling and then smoking a marijuana cigar. Officer Cockerham additionally testified, and the video footage confirms, that conditions were clear at the time the surveillance took place.

appeared to be the tobacco from the inside of the cigar out of the driver's window and continue to prepare the cigar in a way consistent with marijuana use (*i.e.*, replacing the tobacco with marijuana).[29] He then saw Thompson light the cigar and drive away.[30] Once Thompson drove out of the camera's view, Officer Cockerham requested mobile surveillance to follow Thompson while responding officers were rerouted to that part of the city corresponding with his direction of travel. Although Officer Cockerham could not definitively say whether Thompson was indeed rolling and then smoking a cigar containing marijuana, "[i]n determining reasonable suspicion, courts must consider the facts in light of the officer's experience," *United States v. Flowers*, 6 F.4th 651, 656 (5th Cir. 2021), and Officer Cockerham testified on the basis of his extensive experience in both the NOPD and as a task force officer with the FBI – experiences involving narcotics investigations.[31] Therefore, based on these observations and his training and experience, the Court expressly finds that Officer Cockerham had knowledge sufficient to support the reasonable suspicion that Thompson was driving while under the influence of marijuana and carrying a concealed weapon while smoking marijuana.

Based on his testimony and the record evidence, Officer Cockerham's observations necessarily occurred, and were communicated to the responding officers, before the officers

---

[29] The audio-video overlay created by the defendant, R. Doc. 49, confirms that Officer Cockerham reported in near real-time his observation that Thompson dumped what he believed to be tobacco from the cigar out of the driver's window of his vehicle. Additionally, in the affidavit in support of the application for a criminal complaint, Officer Cockerham stated that he observed Thompson "empty tobacco from a cigar onto the ground, which based on his experience, was consistent with preparing a cigar to smoke marijuana." R. Doc. 1 at 4. He also stated that "Thompson lit[] the cigar and then placed the vehicle in drive and proceeded southbound on Allen Street towards North Tonti Street." *Id.* This evidence is consistent with Officer Cockerham's testimony at the suppression hearing that he observed, in real-time, Thompson roll, and then smoke, what he believed, based on his years of experience as an NOPD and federal task force officer, to be a marijuana cigar.

[30] In Louisiana, driving while under the influence of marijuana is a crime. *See* La. R.S. 14:98. It is also a crime in Louisiana to carry a concealed weapon while under the influence of marijuana. *See id.* 40:1379.3. And even possession of marijuana, at some level, is a crime in Louisiana. *See id.* 40:966(E).

[31] Additionally, Officer Cockerham's affidavit submitted in support of the application for a complaint against Thompson indicates that he has been employed by NOPD since January 2009 and that he has been assigned to the FBI New Orleans Violent Crime Task Force since November 2018. R. Doc. 1 at 2.

conducted the traffic stop of Thompson's vehicle. Although the arresting officers admittedly did not personally observe or have independent knowledge of Thompson's actions, they could properly rely on Officer Cockerham's knowledge and observations because there was "some degree of communication" between Officer Cockerham and the officers in the field.[32] *Powell*, 732 F.3d at 369. Through the collective knowledge doctrine, Officer Cockerham's knowledge was imputed to the arresting officers and, because Officer Cockerham had reasonable suspicion to conduct an investigatory stop before the stop itself occurred, the officers involved in Thompson's detention could rely on it to effectuate a constitutionally permissible seizure. *See Ibarra*, 493 F.3d at 530 ("Under the collective knowledge doctrine, it is not necessary for the arresting officer to know all of the facts amounting to probable cause, as long as there is some degree of communication between the arresting officer and an officer *who has knowledge of all the necessary facts*.") (emphasis added).

Nevertheless, Thompson argues that the Government's reliance on the collective knowledge doctrine fails for two reasons. First, he argues that "[u]nder clear, binding caselaw, the necessary facts establishing reasonable suspicion must have been known to Detective Cockerham when he *issued* the order" to stop Thompson, but the order was issued immediately after he observed Thompson in possession of a concealed gun (which Thompson contends could not have constituted reasonable suspicion because Louisiana is a concealed-carry state) but before he observed Thompson enter the car, purportedly roll the blunt, and drive off.[33] Second, Thompson argues that even if the arresting officers could rely upon the knowledge Officer Cockerham gained

---

[32] The audio recording, R. Doc. 44-1, affidavit in support of the criminal complaint, R. Doc. 1, gist sheet, R. Doc. 31-2, and Officer Cockerham's testimony all support the conclusion that he was in direct communication with the officers who conducted the investigatory stop of Thompson. Such direct communication is sufficient for the application of the collective knowledge doctrine here. *See Powell*, 732 F.3d at 371 n.4.

[33] R. Doc. 43 at 4 (emphasis added).

11

*after* his issuance of the order, he "could not have *reasonably* inferred that Mr. Thompson was smoking a marijuana cigar based on the limited information available to him."[34] These arguments, however, are without merit.

It is clear that "[o]fficers may conduct an investigatory stop in reliance on information issued through police channels, such as a wanted flyer or bulletin or a radio dispatch, if the information is based on 'articulable facts supporting a reasonable suspicion that the wanted person has committed an offense.'" *Alvarez*, 40 F.4th at 352 (quoting *United States v. Hensley*, 469 U.S. 221, 232 (1985)). As the Fifth Circuit has recently explained, officers in the field could rely on information in a "round-up packet" issued by other officers to conduct investigatory stops "only 'if the police who *issued* the packet possessed a reasonable suspicion justifying a stop.'" *Id.* (quoting *Hensley*, 469 U.S. at 233) (alteration omitted; emphasis in original). "But if the information 'has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.'" *Id.* (quoting *Hensley*, 469 U.S. at 232). However, this caselaw does not stand for the proposition that an officer's knowledge for purposes of reasonable suspicion – during a dynamic and ongoing investigation like this one – is limited to the first facts relayed to officers in the field before any investigative stop has occurred. As the surveillance unfolded, Officer Cockerham continued to communicate his observations to responding officers as the facts were developing and before the traffic stop happened. The arresting officers did not rely on a static dispatcher bulletin or "round-up packet" issued by Officer Cockerham based solely on his observation of a concealed firearm. *See, e.g.*, *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) (dispatcher bulletin); *Alvarez*, 40 F.4th at 352 (round-up packet). Instead, Officer Cockerham provided officers with real-time intelligence on

---

[34] *Id.* (emphasis in original).

Thompson's actions – which started with his observation of Thompson carrying a concealed firearm but ultimately included his observation of Thompson's preparing and lighting up a marijuana cigar while in the driver's seat of a car right before driving away. And, as the Court has already concluded, Officer Cockerham drew the reasonable inference that Thompson was smoking marijuana based on his personal observations together with his training and experience in narcotics investigations. *See Flowers*, 6 F.4th at 656 ("In determining reasonable suspicion, courts must consider the facts in light of the officer's experience.").

The moment of constitutional significance for purposes of the reasonable suspicion inquiry here is when the traffic stop occurred, not when the initial "call out" was issued. *See Walker*, 49 F.4th at 907 ("A traffic stop is justified at its inception when an officer has an objectively reasonable suspicion that some sort of illegal activity ... occurred, or is about to occur, before stopping the vehicle.") (quotation omitted). In Fourth Amendment terms, the stop itself is the seizure. In this light, even disregarding Thompson's concealed firearm as a stand-alone offense, Officer Cockerham, and, through the collective knowledge doctrine, the arresting officers, had reasonable suspicion that some sort of illegal activity – whether Thompson's driving under the influence of marijuana, or his possessing a firearm while smoking marijuana, or just his possession of marijuana – had occurred, or was about to occur, *before* Thompson's car was stopped. This is enough.

Based on the facts presented, then, the Government has borne its burden of showing by a preponderance of the evidence that the warrantless investigatory stop of Thompson was supported by reasonable suspicion. The evidence gathered as a result of the stop (*i.e.*, the gun and Thompson's inculpatory statements to officers), is not subject to the exclusionary rule and should not be suppressed.

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Thompson's motion to suppress evidence (R. Doc. 31) is DENIED.

New Orleans, Louisiana, this 27th day of April, 2023.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE